## LAJEUNESSE v THE SCHOOL BOARD OF BROWARD COUNTY, FLORIDA

Case No. 84-4246E

State of Florida, Division of Administrative Hearings

August 13, 1985

### APPEARANCES OF COUNSEL

**Linda Raspolich, Abrams, Anton, Robbins, Resnick, Schnieder & Mager,** for petitioner.

**Edward J. Marko, Marko Stephany & Lyons,** for respondent.

### OPINION

DIANE K. KIESLING, Hearing Officer.

### *FINAL ORDER*

Pursuant to notice, a formal hearing was held in this cause on February 28, 1985, and April 3 & 4, 1985, in Fort Lauderdale, Florida,

before the Division of Administrative Hearings by its designated Hearing Officer, Diane K. Kiesling.

## ISSUES

The issues presented for decision are:

1. Whether the educational placement of Ricky Lajeunesse by the School Board of Broward County constituted a free, appropriate public education; and if not, what educational placement would constitute a free, appropriate public education.

2. Whether the School Board of Broward County must reimburse the parents of Ricky Lajeunesse for costs and expenses incurred by the parents in their placement of Ricky at Devereaux School in Pennsylvania.

The Petitioner, Ricky Lajeunesse, presented the testimony of the following witnesses: Dr. Robert Cullen, an expert in Child Neurology; Mr. Bruce Fyne, School Psychologist in Devereaux School; Dr. Robert Ludwig, an expert in the field of Clinical Psychology; Mrs. Hazel Lajeunesse, Ricky's mother; and Mr. Richard Lajeunesse, Ricky's father.

The School Board of Broward County presented the testimony of the following witnesses: Mr. Harry LaCava, North Area Coordinator of Exceptional Student Education; Dr. Lane Roosa, North Area Coordinator of Psychological Services and an expert in psychology; Dr. Colleen Ryan, an expert in education and psychology; Mrs. Elizabeth Yuknus, Principal of Bright Horizons; Mrs. Julie McGinty, Curriculum Assistant at Bright Horizons; Mrs. April Vandenberg, Exceptional Student Education teacher at Bright Horizons; Mr. Alan Navlin, Exceptional Student Education teacher at Bright Horizons; Mrs. Catherine Davis, Guidance Counselor at Bright Horizons; and Mrs. Randy LaRusso, Exceptional Student Education teacher at Bright Horizons.

The Petitioner called one rebuttal witness, Mr. Richard Lajeunesse.

The parties introduced two Joint Exhibits: Joint Exhibit A, the educational records of Ricky Lajeunesse, and Joint Exhibit B, the 1983-84 District Procedures for Providing Special Programs for Exceptional Students, together with the 1984-85 amendments thereto. Petitioner had exhibits 1-4, 7 and 8 admitted into evidence and proferred Petitioner's exhibits 5, 6 and 9. Respondent had one exhibit admitted.

Parties submitted proposed findings of fact and conclusions of law. All proposed findings of fact and conclusions of law have been considered. To the extent that the proposed findings and conclusions

232

submitted are in accordance with the Findings, Conclusions and views submitted herein, they have been accepted and adopted in substance. Those findings not adopted are considered to be subordinate, cumulative, immaterial, unnecessary, or not supported by the competent and credible evidence.

## FINDINGS OF FACT

1. Ricky Lajeunesse is an 11-year old boy who suffers from Early Onset Pervasive Developmental Disorder. He attended Broward County's center for handicapped students, Bright Horizons, from August 1978 through the summer school program ending in 1984.

2. Characteristically, children with a diagnosis of Early Onset Pervasive Developmental Disorder:

(a) are primarily language impaired,

(b) have severe impairment of social skills and relationship skills,

(c) are often misdiagnosed as either deaf or retarded,

(d) do not respond to traditional psychotherapy but require a behavior modification program,

(e) exhibit a range of intellectual potential but may appear untestable using normative instruments,

(f) do not demonstrate a steady learning curve but show program, regression, and plateaus,

(g) frequently engage in self-stimulatory behavior (which may increase around age 8 or 9), and

(h) can never be expected to be truly independent and will always be in need of supervision throughout their lives, which tend to be of normal length.

3. Appropriate educational programs for children suffering Early Onset Pervasive Developmental Disorders need to be structured, behaviorally based, emphasize language development and social skills, utilize criteria reference testing instead of normative testing, and provide an opportunity for the parents to be intimately involved.

4. Bright Horizons is a self-contained center with programming specially designed for handicapped students. The Bright Horizons program:

(a) provides an integrated program for children cover the basic skills and therapy areas,

(b) works very closely with the family and the home situations,

233

(c) implements a comprehensive basic skills curriculum using various curriculum guides,

(d) offers field trips providing opportunities for the informal learning necessary in childhood,

(e) offers opportunities for handicapped students to be exposed to other normal children providing role models for learning such behaviors,

(f) provides a structural management program for behavior modification and management,

(g) conducts support groups for parents,

(h) provides, on an as needed basis, individual parent counselling and home-school behavior management programs.

5. In August 1978, Ricky was placed in the Emotionally Handicapped (EH) program at Bright Horizons. He was evaluated at least yearly and individual educational plans (IEP) were structured and implemented at least yearly. Ricky received special services such as speech and language therapy and occupational therapy in addition to his EH placement.

6. In August, 1981, a new eligibility category was developed by the State Department of Education. This new category was for Severely Emotionally Disturbed (SED) students. Based upon reports from the school psychologist at Bright Horizons, from Dr. Philip Seat, Clinical Psychologist for the School Board of Broward County, and from a Psychiatrist, Dr. Salcedo, Ricky was reevaluated and a determination was made that he was eligible for the Severely Emotionally Disturbed program. This reevaluation and reassessment eligibility and placement was made at a staffingLajich complied with all requirements of law.

7. The SED program at Bright Horizons involved a smaller student/teacher ratio, increased supervision, highly structured class environment, and a therapy component which involved both parents and students.

8. Ricky was reevaluated in June, 1983, and it was determined at the eligibility and placement staffing that continued placement in the SED program at Bright Horizons was appropriate.

9. At least yearly an IEP was prepared by Ricky. The IEP's included use of curriculum designed for Educable Mentally Handicapped (EMH) students. The rules of the State Board of Education allow EMH curriculum to be used with emotionally handicapped students where those students are functioning in a mentally handi-

234

capped range. It is appropriate to use EMH curriculum in order to appropriately place the student in the appropriate range of functioning. Ricky was not programmed as a retardate, but was programmed as a severely emotionally disturbed child.

10. Ricky's parents agreed to and consented to Ricky's placement in the severely emotionally disturbed program at Bright Horizons and agreed to the IEP's prepared yearly.

11. Ricky's programming included a treatment component. For children such as Ricky, treatment is an important program component. Treatment includes behavior management techniques, assisting the child in developing social and interpersonal skills, and a school-based support program to assist and train the parents in managing the child at home.

12. Children in Ricky's class at Bright Horizons were grouped according to their social, emotional, and academic levels of functioning. This grouping eliminated a wide span of difference in terms of the students' behavior, allowing staff to pinpoint the children's needs. In relation to other children in his class, Ricky fell in the middle. He had some positive role models in terms of academics and social behavior and he had some children who were functioning below his level.

13. At all time while attending Bright Horizons, Ricky made educational progress. He made progress in all areas of the curriculum and he achieved goals addressed on his IEP. While the IEP's reflected the same or similar goals, Ricky made progress as demonstrated by his recorded ability to perform assigned tasks more consistently. Ricky also made progress on the goals which reflected attempts to correct and manage his behavior problems. In addition to the goals reflected in the IEP's, Ricky's progress can be assessed by reference to anecdotal records and observations, report card comments, occupational therapy records, testing, and parents/teacher comments.

14. During the 1980-81 school year, Ricky showed progress in writing (quality, length and accuracy) and math (counting, coins, time to the hour, half-hour, and quarter-hour, single digit addition). His behavior did show progress and regression consistent with his diagnosis. He did have crying spells, many of which was unrelated to what was happening in the classroom.

15. During the 1981-82 school year, Ricky demonstrated progress in writing, spelling, and behavior. He improved in the areas of self-help, language arts, academic readiness, general knowledge, and mathematics. Improvements were also noted in Ricky's rapport with teachers

**235**

and peers, for example, appropriate greeting, shaking hands, and eye contact. His in-seat behavior also improved.

16. During the 1982-83 school year, Ricky again made progress in the areas of writing, math, and behavior. However, Ricky's behavior was still inconsistent and he would have crying spells with some frequency.

17. During the 1983-84 school year Ricky demonstrated progress in writing (beginning to write in confined spaces), language (comprehension of words), math (addition problems) and consistency of mastery of goals on his IEP. During this school year, Ricky was working with a standard reading and math series with some success. Ricky's behavior problems, as evidenced by his crying spells, did not improve.

18. Bright Horizons offered a variety of parent training programs during the time that Ricky was enrolled. These programs included group parent training and individual parent training, coordination of home-school behavior programs with parents, and assistance in care. Mr. and Mrs. Lajeunesse were involved in the parent program during the 1982-83 school year. They were not involved and did not attend parent programs during the 1983-84 school year. It is noted that Ricky's increase in inconsistent behavior, including more crying spells, occurred primarily during the school year in which the parents ceased their involvement with the parent training programs at Bright Horizons.

19. In July, 1984, the parents decided to place Ricky in a residential program. They filed an application at the Devereaux School in Pennsylvania. In September, 1984, Ricky's parents took him to the Devereaux School for evaluation and testing. Following the evaluation, Ricky was admitted to Devereaux. Devereaux is an educational institution which provides a 24 hour-a-day program which integrates medical, psychological and educational services for handicapped children. It includes an overly structured environment in which behavior modification techniques are used.

20. The decision to place Ricky at Devereaux was made by the parents on the recommendation of Dr. Robert Cullen, a Child Neurology at Variety Children's Hospital. Dr. Cullen's advice was based on his examination of Ricky and reports of Ricky's parents. Dr. Cullen had no knowledge of the program being followed at Bright Horizons. It was the opinion of Ricky's parents, Dr. Cullen, and Dr. Robert Ludwig that such residential placement was necessary in order to maximize Ricky's educational and behavioral progress.

21. Prior to their unilateral decision to place Ricky in a residential

236

setting, Ricky's parents did not request the School Board of Broward County to change Ricky's placement, change Ricky's IEP's, or provide more services in a restricted environment. In fact, Ricky's parents did not request that the School Board provide assistance with the expenses at Devereaux until November, 1984, after Ricky had already been placed at Devereaux. The first request for financial assistance and placement at Devereaux was in the form of the parents' request for a due process hearing on November 21, 1984. That request alleged a failure by the School Board of Broward County to provide a free, appropriate public education for Ricky.

22. It is undisputed that Ricky has made progress while he has been enrolled at Devereaux. His behavior has improved and he has continued to make progress educationally.

23. In order to maximize Ricky's progress, he needs instruction and behavioral modification during his entire waking day. Because Ricky's behavioral problems interfere with his ability to learn, maximum progress can only be achieved in an overly structured environment.

24. While a residential placement may maximize educational progress, it may not be beneficial for the child in the long-run. According to Dr. Colleen Ryan, institutionalization of children with Early Onset Pervasive Development Disorder results in a situation where the family is not directly involved or trained to manage the child. These children do better when their families are actively involved, with parents taking an active role in education of their children and supervision of their care. Institutionalization results in long-term disruption of the child's functioning. Residential care has a long-term impact on the child's life. As the family becomes less involved in planning for the child, the prognosis as the child ages is extremely poor.

25. Residential placement is the most restrictive alternative. The continuum of less restrictive alternatives to residential placement include: (a) trained caretakers to help after school, (b) parent training, (c) therapy for the family to include behavior modification training, (d) placement in a group home with the child attending a local public school, and (e) family involvement with a group home and training in terms of managing the child on weekends and perhaps on occasion after school.

26. Severely emotionally disturbed children, such as Ricky, characteristically show erratic progress, with peaks and valleys in their functioning. This erratic behavior is to be expected. This type of erratic progress does not mean that an educational plan is not appropriate. In the present case, Ricky's progress is typical. Involvement in the

237

continuum of alternatives to residential placement should be considered and utilized before resort to the most restrictive alternative.

## CONCLUSIONS OF LAW

The Division of Administrative Hearings has jurisdiction of the subject matter of and the parties to these proceedings. Section 120.56(1) and 230.23(4), *Florida Statutes*.

The purpose of the Education of the Handicapped Act, 20 U.S.C. Sections 1401-1461, and the Education for All Handicapped Children Act of 1975, Pub. L. No. 94-142, as set forth at 45 C.F.R. 121a.1(1) is to

> . . . ensure that all handicapped children have available to them a free appropriate public education which includes special education and related services to meet their unique needs.

The term "handicapped children" is defined in 45 C.F.R. 121a.5(a) to mean

> . . . those children evaluated . . . as being mentally retarded, hard of hearing, deaf, speech impaired, visually handicapped, seriously emotionally disturbed, orthopedically impaired, other health impaired, deaf-blind, multi-handicapped, or as having specific learning disabilities, who because of those impairments need special education and related services.

In order to be eligible for enrollment in a special program for the severely emotionally disturbed, Rule 6A-6.3016(3), *Florida Administrative Code*, requires that certain criteria be met:

> (3) Criteria for eligibility for programs for severely emotionally disturbed. A student is eligible for a special program for severely emotionally disturbed if the student meets the criteria in Rule 6A-6.3016(2), FAC, above and there is evidence that the student requires a program which:

> (a) Serves the student for the full school week in a special class;

> (b) Provides a highly structured academic and affective curriculum, including but not limited to art, music, and recreation services which are specifically designed for severely emotionally disturbed students;

> (c) Provides for a lower adult to pupil ratio than programs for emotionally handicapped are designed to accomodate;

> (d) Provides extensive support services specifically designed for severely emotionally disturbed students. These services include but are not limited to:

238

1. individual or group counseling,

2. parent counseling or education, and

3. consultation from mental health, medical, or other professionals; and

4. Cannot be provided in a less restrictive environment.

Section 230.23(4)(m)4, Florida Statutes, provides that:

No student shall be given special instruction or services as an exceptional student until after he has been properly evaluated, classified, and placed in the manner prescribed by rules of the state board. The parent or guardian of an exceptional student evaluated, placed, or denied placement in a program of special education shall be notified of each such evaluation, placement, or denial. Such notice shall contain a statement informing the parent or guardian that he is entitled to a due process hearing on the identification, evaluation, placement, or lack thereof.

Section 230.23(4)(m)2, Florida Statutes, provides that a school board shall provide the required special instruction, classes, and services

. . . either within the district school system, in cooperation with other district school systems, or through contractual arrangements with the approved non-public schools or community facilities which meet standards established by the state board.

The Education for All Handicapped Children Act (the Act), 20 U.S.C. Section 1400 et. seq., defines a "free appropriate public education" to be

. . . special education and related services which (A) have been provided at public expense, under public supervision and direction, and without charge, (B) meet the standards of the State educational agency, (C) include an appropriate preschool, elementary or secondary school education in the State involved, and (D) are provided in conformity with [an] individualized education program.

In the present case, the School Board of Broward County was providing a free public education for Ricky. The question is whether the services provided were appropriate. There is no requirement "that states maximize the potential of handicapped children 'commensurate with the opportunity provided to other children.' " *Board of Education v. Rowley*, 458 U.S. 176, 102 S. Ct. 3034, 73 L.Ed.2d 690 (1982). Indeed, "the process of providing special education and related services to handicapped children is not guaranteed to produce any particular outcome." *Rowley* at 3043. Nor was it intended to guarantee any

239

particular level of education. *Rowley* at 3043. Instead, implicitly, a free appropriate public education must only include access "sufficient to confer *some* educational benefit upon the handicapped child." *Rowley* at 3048. The requirement that the school board provide a free appropriate education is satisfied "by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction. *Rowley* at 3049.

In the present case, the services and educational plan provided to Ricky by the School Board of Broward County did permit Ricky to benefit educationally. Ricky did progress educationally while at Bright Horizons. While attendance at Devereaux or a similar residential program may maximize Ricky's educational progress, such a placement is not required to satisfy the requirements of the Act.

It is recognized that therapy is a necessary component of Ricky's educational plan. Therapy was being provided at Bright Horizons, both as it relates to Ricky and as it relates to his parents. The support services were available, but Ricky's parents did not utilize the parents' programs during the 1983-84 school year. In Ricky's case, a therapeutic environment is necessary in order for him to receive an education. The School Board's obligation is to educate Ricky in an appropriate therapeutic environment, not to provide primary treatment for the handicap itself. *Cohen v. School Board of Dade County, Florida,* 450 So.2d 1238 (Fla. 1st DCA 1984). It is concluded that full time residential placement is distinguished from the program at Bright Horizons only by the extent to which it provides primary treatment for the handicap itself.

In the posture of the present case, the burden of proof is on Petitioner to establish by a preponderance of the evidence that the program offered by the School Board of Broward County is inappropriate to meet Ricky's educational needs. Petitioner has failed to carry that burden. It is concluded that the program offered by the School Board of Broward County, as evidenced by the IEP proposed for the 1984-85 school year and by Ricky's progress at Bright Horizons while he attended Bright Horizons, is appropriate and meets the requirements of the Act.

The Petitioner did show that residential placement may also be appropriate, especially if Ricky's progress is to be maximized. However, the Act's stated policy favors placement of handicapped children in the least restrictive environment. 20 U.S.C. Section 1412(5)(B). Placement at Bright Horizons is the least restrictive environment which will provide some educational benefit for Ricky. Residential placement

240

is the most restrictive environment. Other alternatives exist that are more restrictive than Bright Horizons, but less restrictive than Devereaux. Before placement at a residential program like Devereaux would be appropriate, the less restrictive alternatives must be considered. Here, Petitioner did not provide evidence that less restrictive environments had been considered. For example, if Ricky needs more structure on a daily basis, a structured environment of a group theraputic foster home combined with attendance at Bright Horizons is available. This alternative was not considered by the Petitioner.

Having concluded that the program offered at Bright Horizons, as reflected in the IEP proposed and agreed to by the parents for the 1984-85 school year, was appropriate, the Petitioner's claim for reimbursement for the Devereaux placement must be denied. Even under *Burlington School Committee v. Department of Education*, 105 S. Ct. 1996 (1985), reimbursement for a unilateral placement by the parents is available only when it is ultimately determined that the parents' placement was correct and the school board's refusal to so place was incorrect. Here, it is determined that the School Board's proposed placement is appropriate. Additionally, the parents unilaterally placed Ricky without requesting a due process hearing, without giving the School Board any opportunity to consider the parents' proposed placement or to adjust or modify Ricky's IEP, and without any notice to the School Board of the parents' dissatisfaction with the services provided by the School Board.

It is recognized that Ricky has not been in a program under the supervision of the School Board of Broward County since August, 1984. Therefore, the IEP proposed for the 1984-85 school year may not be appropriate to Ricky's present needs. If Ricky is returned to the public school program provided by Broward County, a reevaluation will be necessary in order to formulate an appropriate IEP for the 1985-86 school year. A temporary IEP will be necessary in order to allow sufficient time for reevaluation and formulation of an appropriate IEP. That evaluation should include consideration of all the alternatives including placement in a group therapeutic home with attendance at public school and placement in a residential setting.

In summary, it is concluded that Ricky's placement at Bright Horizons was appropriate to his needs in 1984. The parents' unilateral placement of Ricky at Devereaux was not justified. The parents' claim for reimbursement of expenses for Devereaux is denied. It is, therefore

ORDERED:

That the parents' request that Rick Lajeunesse be placed in a

residential program be denied and that the parents' request for reimbursement for their unilateral placement of Ricky Lajeunesse at the Devereaux School be denied. The parents may elect to keep Ricky at the Devereaux School, but must do so at their own expense. If the parents return Ricky to the public schools of Broward County, it is further

ORDERED:

That the School Board of Broward County formulate a temporary IEP that will allow sufficient time to reevaluate Ricky's needs as they currently exist. Based upon that reevaluation, the School Board of Broward County shall formulate and propose an IEP for the 1985-86 school year, which proposal shall include consideration of all placement and programming alternatives. Formulation and proposal of the IEP shall be in conformance with the procedural safeguards contemplated by the Act and shall constitute a new point of entry to the due process provisions of the Act.

DONE and ORDERED this 13th day of August, 1985, in Tallahassee, Florida.